UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA                    CRIMINAL NO. 09-cr-00202-1

VERSUS                                      JUDGE WALTER

MIRANDA SIERRA                              MAGISTRATE JUDGE HORNSBY

REPORT AND RECOMMENDATION

**Introduction**

        Before the court is a Motion to Suppress (Docs. 63 and 70) filed by Defendant,

Miranda Sierra.  An evidentiary hearing was held on the motion on December 29, 2009.  For

the reasons that follow, it is recommended that Defendant's Motion to Suppress be denied.

**The Facts**

        The evidence at the hearing, including a video and audio recording of the traffic stop

in question, established the following facts.  In January 2009, the FBI Task Force began

investigating Defendant's co-defendants, Jimmie and Susan Underwood, for distributing

methamphetamine from their home in Shreveport.  The investigation included the use of an

undercover police officer who made several purchases of methamphetamine from the

Underwoods at their home.

        In March 2009, Jimmie Underwood told the undercover officer that his source of

supply of methamphetamine was a female.  A few weeks later, on May 6, 2009, Jimmie and

Susan Underwood told the undercover officer that their source of methamphetamine lived in Georgia.

Just six days later, on May 12, 2009, Jimmie Underwood notified the undercover officer that he had methamphetamine to sell to him.  A controlled buy took place at the Underwood home on that date.  While the undercover officer was at the Underwoods' home, he saw a black Honda Civic with a Georgia license plate parked in the driveway.  The Civic was registered to Defendant, Miranda Sierra, in Georgia.  During the drug transaction, Jimmie Underwood told the undercover officer that he was expecting another shipment of methamphetamine.

Two weeks later, on May 26, 2009, the undercover officer conducted another controlled buy from Jimmie Underwood at the Underwood residence.  Using official FBI "buy money," the undercover officer purchased three and one-half ounces of methamphetamine from Jimmie Underwood for $4,000.  The undercover officer, as well as other narcotics officers who were conducting surveillance, saw Defendant's black Honda Civic at the Underwoods' home during the controlled buy.

At about 5:00 p.m. that evening, Defendant departed the Underwood residence in her Civic.  Narcotics officers followed Defendant to Interstate 20, where she began traveling eastbound in the direction of her Georgia home.  The agents wanted to stop Defendant but they did not want to compromise the ongoing investigation.  Therefore, the agents contacted Troop G of the Louisiana State Police and requested that a state trooper conduct a traffic stop

of Defendant on Interstate 20.  The agents did not relay the details of their investigation to the state police.

Trooper Frank Kuba of the Louisiana State Police was asked to make a traffic stop on Defendant, if he could develop probable cause to do so.  Before making the stop, he spoke very briefly with Agent Brian Driskill, the FBI Task Force Agent who had requested the assistance of the state police.  Driskill asked Kuba to attempt to obtain consent to search Defendant's car.

In Webster Parish, Louisiana, Trooper Kuba's radar showed that  Defendant was driving 80 miles per hour in a 70-mile-per-hour zone.  (The narcotics officers who had followed Defendant on I-20 prior to the traffic stop confirmed that Defendant was driving 80 miles per hour.[1])  Trooper Kuba initiated a traffic stop.  Defendant does not seriously contest that she was, in fact, exceeding the speed limit.

The video recording (which is contained on two DVDs) shows that, at the beginning of the traffic stop, Trooper Kuba asked Defendant to step out of her car.  Defendant asked Trooper Kuba if she could roll up her windows because she did not want her dog to jump out of the car.  Trooper Kuba allowed Defendant to roll up the car windows.  Kuba also asked Defendant if she had any weapons on her.  Defendant responded that she did not.

---

[1] The narcotics agents did not participate in Trooper Kuba's traffic stop.  To avoid compromising their narcotics investigation, they proceeded to the next exit and then drove to the Minden, Louisiana Police Department.

Trooper Kuba directed Defendant to move to the rear of Defendant's vehicle (in the front of Trooper Kuba's patrol vehicle) for safety reasons.  At the time of the stop, Defendant was approximately three months pregnant, and Trooper Kuba and Defendant briefly discussed the pregnancy.   Defendant rubbed her stomach frequently throughout the traffic stop.

Trooper Kuba advised Defendant that she was stopped because she was driving 80 miles per hour in a 70-mile-per-hour zone.  He asked Defendant for her driver's license, insurance, and registration.  He also asked Defendant about her itinerary.  Defendant stated that she was leaving Shreveport and returning to her home in Dallas, Georgia.  Trooper Kuba observed that Defendant had no shoes on at the time of the stop.  He told Defendant he was going to write her a ticket for speeding, then he returned to his patrol car to run computer checks and verify the validity of her license.  During this time, Defendant stood in front of the patrol car, while frequently rubbing her stomach.  The video also shows Defendant going through some papers in her wallet.

Trooper Kuba called in Defendant's Georgia driver's license number to dispatch.  The audio then falls silent for quite some time, presumably while Trooper Kuba is writing Defendant's speeding ticket and filling out the consent to search form that will be discussed infra.[2]

---

[2] The Government contends that, during the course of the traffic stop, Defendant exhibited signs of unusual nervousness, including pacing from side to side and failing to make eye contact with Trooper Kuba.  A careful review of the video does not support the

Trooper Kuba exited his patrol car and approached Defendant.  Kuba told Defendant that he was issuing her a speeding ticket for driving 80 miles per hour in a 70-mile-per-hour zone.  He told Defendant that the speeding laws were strictly enforced.  Kuba provided information about who Defendant should call in Webster Parish to take care of the ticket.

After issuing the ticket to Defendant, Trooper Kuba returned Defendant's paperwork to her, and he immediately engaged Defendant in a dialogue which eventually resulted in Defendant's written consent to the search of her car.  Prior to initiating that conversation, Trooper Kuba did not say anything to Defendant to indicate that Defendant was free to leave, and the video confirms that Defendant made no movement to return to her car before Trooper Kuba initiated the consent dialogue.

Trooper Kuba told Defendant that, while doing his job, he sees "a lot of stuff" on the interstate.  He then asked Defendant if there was any reason why he could not look in her car.  Defendant responded, "Only my dog being in there."  Kuba again asked, "Would you have a problem if I look inside the vehicle."  Defendant responded, "You can look inside the vehicle.  I feel like you are invading my privacy, but there is nothing inside the vehicle."

Defendant  explained that she has had trouble with the law before (the evidence showed that she has a prior federal drug conviction) but that she is now clean.  Defendant reiterated that there was nothing inside her vehicle.  Kuba then asked, "So, you don't want me to look inside?"  Defendant stated: "I've not given you any reason, no probable cause."

---

Government's contentions.

Kuba responded by telling Defendant that she was giving him probable cause at that very moment because she was acting jittery and was shaking.  Kuba then asked, "So you don't want me to look inside?"  Defendant responded, "If you can do it without my dog jumping out."  Kuba and Defendant then talked about how the dog could be secured during the search.

Defendant asked Kuba what would happen if she did not give him consent.  Kuba responded that he would call for a canine to sniff the car, and, if the canine "hit" on the car, that would provide probable cause to search the car.  Defendant then threw her hands up into the air and stated: "I don't care what you do."  Kuba then presented the written consent to search form that he had prepared in his patrol car (at the same time he filled out the traffic citation).  Kuba reviewed the blanks on the form with Defendant, then told Defendant to "just sign right here."  Defendant immediately signed the consent form.  Kuba then secured Defendant's dog by placing the dog in the back of the patrol car.  Defendant signed the consent form approximately 13 minutes into the traffic stop.[3]

Kuba approached the passenger side front door of Defendant's vehicle and immediately saw an open purse with a very large amount of cash and a syringe.  Government Exhibit 4 is a photograph of the cash and syringe inside a Liz Claiborne purse.  Kuba found black electrical tape, another syringe, and a zip-top plastic bag on the floorboard.  A photograph of two "balls" of electrical tape around plastic bags was introduced as Government Exhibit 5.

---

[3] The consent form was introduced into evidence as Government's Exhibit 3.

The video recording shows that, while Trooper Kuba searched Defendant's vehicle, Defendant calmly talked to another trooper.[4]   Defendant never made any effort to stop the search or revoke or limit her consent to the search.  In fact, when Trooper Kuba removed a box from the trunk of Defendant's car, Defendant volunteered: "You can open that box if you want to."   Trooper Kuba then returned to his car and placed a telephone call to Agent Driskill.  The recording ends abruptly at that point.

Defendant's vehicle was removed from the side of I-20 to the Minden Police Department where narcotics agents searched it more thoroughly.  In addition to the other items already noted, the search revealed a Wal-Mart receipt dated May 24, 2009 (two days before the stop) showing the purchase of five rolls of electrical tape and a notebook containing names and figures consistent with use as a drug ledger.  Of the $7,886 in currency located inside Defendant's purse, $4,000 of that was official FBI buy money.

Once the search was completed, Defendant was allowed to leave the police station and return home to Georgia.  Defendant was the suspected source of supply to Jimmie and Susan Underwood, and the narcotics agents released Defendant to allow that investigation to go forward.

---

[4] For the safety of their troopers, the Louisiana State Police generally wait for back-up to arrive before conducting a road-side search.

**Analysis**

**Probable Cause**

Under the automobile exception to the warrant requirement, a lesser expectation of privacy attaches to a vehicle when it is being used on the highways.  <u>California v. Carney</u>, 471 U.S. 386, 392 (1985).  Therefore, officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains contraband or evidence of a crime.  <u>Mack v. City of Abilene</u>, 461 F.3d 547, 552 (5th Cir. 2006).   Whether probable cause exists requires a practical, common-sense determination of whether the circumstances, including information obtained from an informant, establish that there was a fair probability that contraband or evidence of a crime will be found in a particular place.  <u>United States v. Steele</u>, 2009 WL 4039444 (5th Cir. 2009).

The Government argues that the search of Defendant's car was justified based on the narcotics officer's probable cause to believe that Defendant was the source of methamphetamine supply for Jimmie and Susan Underwood and that Defendant's car would contain evidence, including FBI buy money, from the recent transactions observed by the undercover officer.  It is obvious that Trooper Kuba did not have probable cause to believe that Defendant was involved in narcotics trafficking.  Trooper Kuba knew none of the background details concerning Defendant and the Underwoods, and knew only that narcotics agents wanted him to stop Defendant's car and develop probable cause (or obtain consent)

for a search.  However, the Government contends that probable cause still existed for Trooper Kuba's search under the collective knowledge doctrine.

The Fifth Circuit has applied the collective knowledge doctrine in two distinct types of cases: (1) those where the arresting officer has no personal knowledge of any of the facts establishing probable cause, but simply carries out directions to arrest given by another officer who does have probable cause, e.g., United States v. Impson, 482 F.2d 197 (5th Cir. 1973); United States v. Allison, 616 F.2d 779 (5th Cir. 1980); and (2) those where the arresting officer has personal knowledge of facts which standing alone do not establish probable cause but, when added to information known by other officers involved in the investigation, tips the balance in favor of the arrest, e.g., United States v. Nieto, 510 F.2d 1118, 1120 (5th Cir.); United States v. Agostino, 608 F.2d 1035, 1037 (5th Cir.1979).

In the former cases, the officer who issues the directive must himself have probable cause to arrest. Weeks v. Estelle, 509 F.2d 760, 765 (5th Cir.), cert. denied, 423 U.S. 872 (1975); United States v. Simpson, 484 F.2d 467, 468 (5th Cir.1973). In the latter cases, the "laminated total" of the information known by officers who are in communication with one another must amount to probable cause to arrest. United States v. Edwards, 577 F.2d 883, 895 (5th Cir. 1975) (en banc); Agostino, 608 F.2d at 1037; United States v. Webster, 750 F.2d 307, 323 (5th Cir. 1984).  Thus, the arresting officer need not have personal knowledge, if being directed by another who does. See, e.g., United States v. Ibarra, 493 F.3d 526, 530 (5th Cir. 2007)(probable cause existed under collective knowledge doctrine where arresting

officer did not know all of the facts; arresting officer was told to be on the look-out for a certain vehicle and to make a traffic stop if the driver violated any traffic laws).  The collective knowledge doctrine is not limited to probable cause for arrests; it has also been applied in the context of reasonable suspicion for a traffic stop.  See, e.g., United States v. Carmenate, 2009 WL 2998568 (5th Cir. 2009) (collective knowledge supported reasonable suspicion for traffic stop); United States v. Cortez, 2008 WL 5068619 (5th Cir. 2008)(collective knowledge provided reasonable suspicion for traffic stop and justified continued detention while the officers waited for canine to arrive).

The narcotics officers' observations of Defendant's vehicle at the home of Jimmie and Susan Underwood at times when supplies of methamphetamine were arriving, together with Jimmie Underwood's statements, provided probable cause to believe that Defendant's vehicle contained evidence, including FBI buy money, used in the drug transactions. Jimmie Underwood told the undercover officer in March 2009 that his source of methamphetamine was a female.  On May 6, 2009, he told the undercover officer that his source of supply lived in Georgia.  On May 12, 2009, the undercover officer conducted a controlled buy from the Underwoods' residence and Defendant's black Honda Civic (with Georgia license plates) was located at the Underwoods' residence at the time of the purchase. On that occasion, Jimmie Underwood told the Defendant that he was expecting another shipment, and the undercover officer made an additional purchase from Jimmie Underwood on May 26, 2009 (the date of the traffic stop).  Again, on the date the methamphetamine

arrived at the Underwoods' home, Defendant's black Honda Civic was located at the Underwoods' residence. The narcotics officers then followed Defendant on I-20 as she headed in the direction of her home in Georgia.

Under the totality of the circumstances, the narcotics officers had probable cause to believe that Defendant's black Honda Civic would contain evidence of the recent methamphetamine transactions. In other words, there was a fair probability that Defendant's vehicle would contain drugs, FBI buy money, or other contraband related to the drug deals. However, rather than compromising their ongoing investigation, they asked Trooper Kuba to conduct a pretextual traffic stop in an effort to obtain Defendant's consent to the search of her car. Under the collective knowledge doctrine, Trooper Kuba had probable cause to search Defendant's car during the traffic stop for evidence of methamphetamine transactions.

**Defendant's Consent**

The Government argues that, even if there was not probable cause to support the search of Defendant's car, the search is valid based on Defendant's written consent which was obtained at the conclusion of a valid traffic stop. Defendant, on the other hand, argues that her consent to the search was not voluntary but was the result of duress, coercion, and the assertion of authority by Trooper Kuba. Defendant argues that her statement "I don't care what you do" in response to Trooper Kuba's repeated requests for consent to search the car was a mere expression of futility. Defendant argues that her signature on the consent to

search form should not be viewed in a vacuum, but instead viewed in light of Defendant's prior expressions of reluctance to grant Trooper Kuba consent to the search.

**Law Regarding Traffic Stops**

The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). See Knowles v. Iowa, 525 U.S. 113, 117 (1998); Berkemer v. McCarty, 468 U.S. 420, 439 (1984); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)(en banc).   Under the two-part Terry reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20; Brigham, supra at 506-507; U.S. v. Lopez-Moreno,  420 F.3d 420, 429-434 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100, 102 (5th Cir.1995).   In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981).  Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure.

See, e.g., United States v. Santiago, 310 F.3d 336, 340 (5th Cir.2002).  In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. Arvizu, 534 U.S. at 274. However, it is clear that the officer's mere hunch will not suffice. Terry, 392 U.S. at 27.  It is also clear that reasonable suspicion need not rise to the level of probable cause. Arvizu, 534 U.S. at 274.

 An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses.  United States v. Lenz, 162 Fed. Appx. 379, 382 (5th Cir. 2006).  Thus, an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment.  Scott v. United States, 436 U.S. 128, 138 (1978); Devenpeck v. Alford, 543 U.S. 146, 153 (2004).  See also Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1997) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ....").

 As for the second prong of the Terry inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Brigham, 382 F.3d at 507.  In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08.   An officer

may also ask the driver about the purpose and itinerary of his trip. Id. at 508.  Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510.  See also Santiago, 310 F.3d 336, 341-42 (5th Cir. 2002); United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000).  A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); U.S. v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006).  However, mere "uneasy feelings" and inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking.  U.S. v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006).

**Reasonable Suspicion**

There is no doubt that the traffic stop initiated by Trooper Kuba was justified at its inception.  Trooper Kuba had, at a minimum, reasonable suspicion that a traffic violation (speeding) had been committed by Defendant.  But, Trooper Kuba also had more than that.

Under the collective knowledge doctrine, Trooper Kuba also had reasonable suspicion that Defendant's vehicle would contain evidence of recent methamphetamine transactions involving the Underwoods and the undercover officer.

**Length of the Detention**

Trooper Kuba did not unduly prolong the stop in an attempt to obtain Defendant's consent to the search.  Kuba completed the computer check, wrote the speeding citation, and obtained Defendant's written consent in a mere 13 minutes.  Given the officers' reasonable suspicion that Defendant was engaged in the trafficking of methamphetamine, the stop was not unduly prolonged.  Trooper Kuba knew that narcotics officers were conducting a narcotics investigation regarding Defendant (although he did not know any details), and he knew that those officers wanted him to search the car.  The officers knew that Defendant had a federal drug conviction in 2002, and given their knowledge of the investigation involving Defendant, the undercover officer, and the Underwoods, it is reasonable to conclude Trooper Kuba did not improperly prolong the stop to obtain Defendant's consent.

**The Written Consent Form**

The Government argues that Defendant freely and voluntarily consented to a search of her vehicle, as evidenced by the Defendant's signature on the consent to search form (Government Ex. 3).  The Government bears the burden of proving that consent was free and voluntary.  United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993). In determining whether a search based upon consent is valid, the government must prove that the search was

voluntary and that the defendant consented to the search or consent was obtained from a third party with the ability to give valid consent.  United States v. Jenkins, 46 F.3d 447, 451-452 (5th Cir.1995).

In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, no one of which is dispositive. These factors include:  (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of her right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.  Id. An analysis of these factors shows that Defendant's consent to the search was voluntary.

With respect to the first factor, the voluntariness of Defendant's custodial status, it cannot reasonably be said that Defendant believed she was free to leave at the time Trooper Kuba sought her consent to the search.  Trooper Kuba never told Defendant she was free to leave, and there was no natural break in the chain of events between the issuance of the ticket and Trooper Kuba's request to search the vehicle.  In fact, Trooper Kuba told Defendant that if she did not consent to the search that he would request a canine.  Thus, Defendant did not think she was free to leave at the time of her discussion with Trooper Kuba about consent, and, in fact, she was not free to leave.

With regard to the second factor, the presence of coercive police procedures, Trooper Kuba did not coerce Defendant into consenting to the search.  Trooper Kuba's statement to

Defendant that, if she failed to consent, that he would request a canine, was not coercive –
it was a statement of fact.  There was nothing improper about Trooper Kuba's "threat" to
request a canine.  Trooper Kuba knew that narcotics agents were investigating Defendant,
so the possibility of a request for a canine was not unreasonable.  Faced with the possibility
of a canine sniffing the air around her vehicle, Defendant probably made a calculated
decision to take her chances with Trooper Kuba: because she had no drugs in the car at that
moment, Kuba might not find anything incriminating.  But if a canine sniffed the vehicle, the
canine might alert because drugs had recently been transported in the vehicle.  <u>See</u>, <u>e.g.</u>,
<u>United States v. Wolfe</u>, 2009 WL 330214 (N.D. Tex. 2009)(reinstatement of consent to
search vehicle may have been initially influenced by the trooper's statement that a canine
would be called, but consent was not a product of coercion or given as a result of threats by
the trooper; defendant likely believed the trooper would not find the concealed drugs, a less
certain prospect than if a drug dog were called to the scene).  Defendant did not know about
the on-going narcotics investigation concerning her and the Underwoods, so she probably
believed that Trooper Kuba would not consider the bundle of cash to be incriminating.

  With regard to the third factor, Defendant was cooperative with Trooper Kuba.
Trooper Kuba was professional and cordial to Defendant throughout the stop, and Defendant
was polite and cordial to Trooper Kuba.  While Defendant engaged in a dialogue with
Trooper Kuba that shows that Defendant was, at least initially, reluctant to consent to a
search, the audio recording of the traffic stop shows that Defendant never refused any of

Trooper Kuba's requests.   In fact, it appears that Defendant wanted to appear very cooperative to Trooper Kuba by engaging in dialogue with him about searching the car.  That cooperation continued even throughout the search.  When Trooper Kuba removed the box from the trunk, Defendant voluntarily revealed its contents and told Trooper Kuba that he was free to open the box.  And while Trooper Kuba was searching Defendant's car, Defendant was conversational with the back-up officer, and she showed no signs of distress or other unpleasantness.

With regard to the fourth factor, awareness of the right to refuse consent, Defendant's conversation with Trooper Kuba about consent shows that she knew she could refuse to consent.

As to the fifth factor, Defendant's education and intelligence, the evidence shows that she was a high school graduate who understood (and personally raised the issue of) probable cause and privacy issues.  While it does not appear from the video that Defendant read the substantive language in the consent to search form, she was clearly able to do so.  That form advised her that she could refuse consent to the search and that she could revoke her consent at any time.

The final factor, Defendant's belief that no incriminating evidence will be found, weighs in favor of the Government.  During her conversation with Trooper Kuba, Defendant repeatedly stated that nothing was in her car.  In fact, Defendant knew she was not carrying

any illegal drugs at the time of the search, and no drugs were found.[5]  Defendant was not aware of the ongoing narcotics investigation, and it is likely that she had no reason to believe that Trooper Kuba would suspect the cash in her purse was drug proceeds.

**Conclusion**

Based on the collective knowledge of the officers, probable cause existed for the search of Defendant's vehicle by Trooper Kuba.  Based on the information provided by the undercover officer and his transactions with Jimmy and Susan Underwood, as well as the narcotics officers' personal observations of Defendant's vehicle at the Underwood residence at the time of the delivery of methamphetamine, the officers had probable cause to believe that Defendant's car would contain evidence of the recent methamphetamine transactions. Because the officers had probable cause to search Defendant's car, the court need not reach the issue of consent.

Even if probable cause did not exist, Trooper Kuba obtained Defendant's consent to the search during a valid traffic stop.  There was, at a minimum, reasonable suspicion that Defendant was the source of methamphetamine to the Underwoods.  Trooper Kuba was aware that there was a narcotics investigation involving Defendant, and he acted appropriately during the traffic stop to take steps to resolve that reasonable suspicion.

---

[5] The Government witnesses testified that one of the syringes found in Defendant's car tested positive for methamphetamine, but the syringe was apparently discarded by the Government after that test was administered.

Defendant freely and voluntarily consented to the search of her car, and Trooper Kuba did not unreasonably prolong the traffic stop to obtain that consent.

Accordingly;

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Docs. 63 and 70) be **denied**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b).  A party may respond to another party's objections within **seven (7) days** from the filing of the objections.  Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 20th day of January, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE